THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

THE UNITED STATES OF AMERICA,
STATE OF TENNESSEE
ex rel. MARK STUDDARD                                    **Plaintiffs**

**v.**                                         **Civil No. 1:20cv025-MPM-DAS**

MAGNOLIA REGIONAL HEALTH
SERVICES, INC., et al.                                  **Defendants**

**ORDER**

This cause comes before the court on the motion of various defendants to dismiss this case pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs Mark Studdard *et al* have responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is, *inter alia*, a False Claims Act ("FCA) case based on allegations that certain Corinth physicians and medical clinics, including the defendants in this case, violated federal statutes, including the Anti-Kickback Statute ("AKS") and the Stark Law, by referring patients to a dedicated cancer care facility in which they were investors. The AKS makes it illegal to offer or pay remuneration to induce referrals of individuals for the furnishing of services paid for by a federal health care program. 42 U.S.C. § 1320a-7b(b)(2). The Stark Law provides that, if a physician has a "financial relationship" with an entity, then (i) the physician "may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under [Medicare]," and (ii) "the entity may not present or cause to be presented a claim" to Medicare for such services. 42 U.S.C. § 1395nn(a)(1). The complaint in this case further alleges that, by falsely certifying that their Medicare billings were in compliance with the

law, defendants violated the False Claims Act.  To state a claim under the FCA, a plaintiff must allege: (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that is presented to the government." *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010).

With the foregoing authority in mind, this court notes that the cancer center at issue in this case is Magnolia Cancer Center, LLC ("MCC"), and it represented a joint venture which was formed in 2007 between Magnolia Regional Health Center ("MRHC") and several physician-investors, including the Individual Defendants, to treat patients in and around Corinth.  MCC was voluntarily dissolved in 2020, and defendants admit that this occurred after a consultant advised them "that the structure could *possibly* be perceived as contrary to the AKS or Stark laws."  [MDHS defendants' brief at 2-3 (emphasis in original)].

The *qui tam* "whistleblower" in this case is relator Mark Studdard, who formerly served as the Executive Director of MCC.  Studdard's "bombshell" allegation in this case is that he was personally present when, he claims, former MRHC CFO Mark Nakagawa stated that MCC had to be dissolved because it violated federal law.  Specifically, the Second Amended Complaint alleges that:

86. Relator Studdard became Executive Director/Vice-President of MCC around 2008/2009.  Since that time and up to the time of dissolution, there were multiple attempts to unwind the joint venture and restructure MCC; however, these efforts never came to fruition as the complaints went unaddressed by those superior to Relator and did not result in an unwinding of the impermissible relationship in which MRHC was the majority shareholder. MRHC CFO, Mark Nakagawa, stated on multiple occasions including January 27, 2020 and March 10, 2020, that the joint venture is illegal.

87. On March 10, 2020 Mark Studdard was in a meeting with CEO James Hobson and CFO Mark Nakagawa. In the meeting they discussed the cancer center and unwinding the joint venture.  They discussed the potential ways to value the shares if they had to buy the shares from the physician investors to unwind the joint venture.  During the conversation, CFO Mark Nakagawa stated emphatically that the way the joint venture currently exists was illegal and MRHC's participation in the joint venture was illegal and that is why it

had to be dissolved. Nakagawa stated the joint venture was a per-click agreement, and per-click agreements were illegal since the beginning of Stark.

[SAC at 26-27].

This court notes that, while this case was stayed for a lengthy period of time while the United States and the State of Tennessee decided whether to intervene,[1] this order represents its first opportunity to consider the allegations of this case. That being the case, this court will make some basic observations regarding its approach to Rule 12 motions to dismiss, and, to a lesser extent, to overseeing a civil lawsuit as a whole. As always when this court considers an initial motion to dismiss, it does so in full awareness of the fact that the Federal Rules of Civil Procedure give the plaintiff the right to conduct extensive discovery, and it likewise provides for liberal rights for the plaintiff to amend and supplement the allegations of his complaint, as further facts become available. That being the case, this court is more concerned, when considering an initial motion to dismiss, whether the overarching legal theory of the case is sound, since the Federal Rules grant the plaintiff such an extensive ability to fine-tune and supplement the initial allegations of his complaint as necessary.

To state it differently, this court is more concerned, at the Rule 12 dismissal stage, with the *forest* of the plaintiff's basic allegations, and it appears that, in their motions to dismiss, the defendants in this case frequently seek to direct its attention not only to the *trees*, but to the individual *leaves* of those trees. For example, defendants cite what they claim to be the paucity of allegations in the amended complaint regarding specific referrals of patients by particular physician/defendants. However, this court notes that the complaint does contain extensive allegations in this regard and, at any rate, this is the sort of information which can be developed

---

[1] Each of them elected not to intervene.

3

in discovery and included, if necessary, in another amended complaint.  The question at this stage is simply whether relator should be granted an opportunity to proceed to these next steps in the litigation process, and not whether his complaint presents a FCA lawsuit which is ready to go to trial.

Even with these caveats, it is clear to this court, in reading relator's sixty-five page second amended complaint, that he put a great deal of effort into it, and it appears that the "forest" of his allegations is of a quite robust nature.  In so stating, this court begins with the relator's "bombshell" allegation, quoted above, that the joint venture in this case was "unwound" based on the conclusion of company executives that it constituted a violation of the very same federal statutes at issue in this case.  As a former MCC executive himself, relator was clearly in a position to know what concerns motivated the decision to unwind the company, and it is highly problematic for defendants that he alleges that concerns over the basic legality of the joint enterprise were paramount in this regard.  Of course, this court is required at the Rule 12 stage to accept the allegations of the complaint as accurate, and, having done so, it is difficult to discern how it could decide that this lawsuit should be dismissed at its very outset when the relator alleges that company executives agreed with his basic contention that the MCC joint venture represented a violation of federal law.

The relator's "bombshell" allegation aside, there appears to be considerable objective written proof in the record supporting his contention that MCC was unwound based on concerns, among its participants, regarding its legality.  Indeed, in their motion to dismiss, defendants note the complaint's allegation that a participating physician e-mailed his concerns about the legality of the venture to plaintiff.  Specifically, the complaint alleges that:

> On January 18, 2018, Richard Taylor ("Taylor") of Oncology Solutions, LLC sent an
> email to Relator in which he articulated a concern that "the investor physicians and their

income [were] tied to how much revenue [MCC] generate[d]." Compl. ¶¶ 14, 104; *see* Exhibit B & *supra* note 5. In a part of the email not quoted in the Complaint, Taylor also acknowledged "there are exceptions in a rural community … and there may be one here." Exhibit B. He urged Studdard to "check to be sure" because "[t]he rules continue to get tougher and tougher." *Id*.

[Brief at 5].   A copy of the e-mail in question was included as an attachment to the complaint, and, in that e-mail, Dr. Taylor expressed his concern that the joint venture was set up in such a way that participating physicians had a financial incentive to refer patients to MCC, since doing so increased their own investment income.  [Docket entry 75 at 2].  Specifically, Dr. Taylor noted that, while he was not required to refer patients to MCC, "the more I refer, the more I make."  [*Id.*]  In raising concerns regarding how a joint venture which gave physicians investment profits in exchange for referrals could be regarded as an illegal "kickback" scheme, Dr. Taylor was raising concerns which seem quite obvious, at least to this court.  This is, indeed, not rocket science.

This court believes that the story gets even worse for defendants when one considers the 2007 Offering Memorandum which was sent to prospective physician investors and which, like Dr. Taylor's e-mail, is attached as an exhibit to the complaint and thus may be considered in the Rule 12 context.  That Offering Memorandum spends several pages discussing the basic uncertainty regarding whether the proposed MCC joint venture was legal under the AKS and Stark laws, and, rather devastatingly in this court's eyes, it informs potential investors that no advisory opinion would be sought regarding its legality beforehand.  The crucial language of the memorandum is even written in bold type and plainly informs potential investors that:

> THE ANTI-KICKBACK LAW CAN IMPLICATE A BROAD RANGE OF TRANSACTIONS AND THE AGENCIES RESPONSIBLE FOR ENFORCEMENT HAVE CONSIDERABLE DISCRETION.  NO ASSURANCE CAN BE GIVEN THAT MCC OR ITS OPERATIONS WILL NOT BE REVIEWED AND CHALLENGED BY ENFORCEMENT AUTHORITIES OR THAT, IF CHALLENGED MCC OR ITS MEMBERS WOULD PREVAIL.  MCC DOES NOT PLAN TO SEEK AN ADVISORY

OPINION ON WHETHER A PARTICULAR VENTURE OR TRANSACTION COMPLIES WITH OR VIOLATES THE ANTI-KICKBACK LAW, PROSPECTIVE INVESTORS ARE ENCOURAGED TO CONSULT COUNSEL CONCERNING THE POTENTIAL IMPACT OF THIS STATUTE.

[Offering memorandum at 28].

It thus appears to this court that defendants made a conscious decision that they were not going to "due diligence" their way out of a good investment (some would say kickback scheme), and it further appears that, in making this decision, they bought themselves the current lawsuit. The fact that the physician investors in this case knew that they were "living dangerously" in the interests of investment profits (some would say greed) is further confirmed by the Offering Memorandum's notation that certain "safe harbors" exist under the AKS which allow physicians to invest in a manner which would give them reassurance that they were complying with the law. The Offering Memorandum made it clear that MCC would *not* be structured in a way to comply with an AKS safe harbor, stating that:

> A safe harbor also exists for certain management agreement and other personal services agreements. MCC and MRHC anticipate that the terms of MRHC's lease of personnel to MCC and for MCC's provision of services to MRHC will meet a number of criteria under the safe harbor, but the safe harbor includes a requirement for the aggregate compensation payable over the term of the agreement to be set in advance. The aggregate compensation payable for personnel leased by MRHC and the aggregate compensation paid by MRHC to MCC for services will not be set in advance. Accordingly, the transactions will not meet all criteria under the safe harbor, and no assurances can be given that arrangements between MCC and MRHC or other arrangements affecting MCC will not be reviewed and challenged by federal enforcement authorities.

[*Id.* at 28].

This court believes that these exhibits constitute quite damaging evidence in this case, and it is not at all clear to it exactly what evidence defendants might develop in discovery which would "explain it all away" and thereby make it appropriate for this court to take this matter from a jury's consideration. In so stating, this court makes the basic observation that, if

defendants themselves were very much uncertain that the joint venture in this case complied with federal law, and eventually appear to have unwound MCC based upon the belief that it did not, then on what basis might this court, considering the facts in the light most favorable to plaintiff, determine that fact issues do not even exist in this regard? Thus, while this court is presently only considering a Rule 12 motion to dismiss and not a Rule 56 summary judgment motion, it believes that it has "seen enough" from the above evidence to harbor a strong inclination to eventually allow jurors to consider the issues in this case.

This court's inclination in this regard is strongly influenced by MCC's decision, right at the outset, not to seek an advisory opinion regarding the basic legality of the joint venture. In their briefing, defendants rely heavily upon language in the Offering Memorandum which notes MCC's *belief* that the joint venture was legal, but this court submits that actions speak louder than words in this regard. The Offering Memorandum openly acknowledged very considerable uncertainties regarding whether the joint venture was legal, and, in light of these uncertainties, it is very difficult for this court to excuse the decision not to do basic due diligence by seeking the opinion of experts who did not stand to profit from MCC's operation. It frankly appears to this court that the defendant physicians may have been so enticed by the prospect of being able to profit from their own referral of patients to MCC that they were afraid to find out whether the obvious AKS and Stark concerns arising from this arrangement could be overcome.

Having chosen to go down this dangerous path, it seems unreasonable for defendants to expect this court to pull their chestnuts out of the fire for them. In so stating, this court would hasten to add that it likewise has no present intention to decide this case in *relator*'s favor, either at the summary judgment or directed verdict stage. To the contrary, it appears to this court that both sides have legitimate arguments to make in this case, and its present intention is to allow

them to do so before a jury. Having stated its inclination in this regard, the court notes that

nothing in defendants' briefing suggests that the applicable law will require a different result,

particularly with regard to plaintiff's AKS claims. In so stating, this court notes that defendants'

briefing does raise the possibility that they might eventually prove to have a defense to the Stark

claims against them, inasmuch as that law includes an exception for underserved rural

communities. This "rural community" exception is in the nature of an affirmative defense which

must be proven by defendants, not plaintiff, but it at least seems possible to this court that

Corinth will eventually be determined by a jury to qualify in this regard and thereby provide a

defense to any Stark claim. However, if defendants have a potential "get out of jail free" card

with regard to the AKS claims against them, then they do not mention it in their briefing.

Indeed, in the section of their brief entitled "No Underlying AKS Violation," the entirety

of defendants' argument is as follows:

> With respect to the AKS, Studdard alleges that the arrangement between MCC and its
> owners was *per se* illegal because it failed to satisfy one of that statute's regulatory "safe
> harbors." Compl. ¶ 58. But this is incorrect as a matter of law. The Office of the Inspector
> General ("OIG") for the Department of Health and Human Services established AKS safe
> harbors to provide protection and reassurance for certain types of investment
> arrangements that the OIG has concluded present sufficiently low risk of fraud and abuse.
> 42 C.F.R. § 1001.952. However, the inability to qualify for safe harbor protection does
> not mean an arrangement is a *per se* violation of AKS. *See* 85 Fed. Reg. 77684, 77689
> (Dec. 2, 2020) ("Deviating from a safe harbor does not mean that an arrangement violates
> the anti-kickback statute. For arrangements that do not fit in a safe harbor, liability is
> determined based on the totality of facts and circumstances, including the intent of the
> parties."). In fact, the OIG has acknowledged that compliance with the AKS safe
> harbors is "voluntary," and that even if an investment arrangement does not satisfy the
> safe harbor's requirements, OIG may nonetheless consider it a permissible arrangement
> with a low risk of violating the AKS. 64 Fed. Reg. 63518, 63521 (Nov. 19, 1999). Thus,
> even if MCC's ownership structure did not fall within a regulatory safe harbor, that does
> not establish an AKS violation as a matter of law.
>
> To state a claim, Studdard is required to plead facts sufficient to support an *actual*
> violation of the AKS, which he has failed to do. Instead, his rote allegation that MCC's
> joint venture arrangement violated the AKS is contradicted by the plain language of the
> Offering Memorandum and the Operating Agreement incorporated into the Complaint, as

well as by the affirmative allegations contained in the Complaint – all to the effect that there was no requirement that any physician-investors make patient referrals to MCC, and that distributions to those investors were based solely on their ownership percentage and were not tied to the referrals in any way. *See supra* Part II at 6. Put another way, Studdard's generalized and unsupported claim that there is an underlying AKS violation giving rise to his FCA claims is implausible. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The factual content here suggests precisely the opposite.10

[Brief at 13-14].

Thus, the first paragraph of defendants' AKS briefing notes that MCC's failure to meet any of the law's "safe harbor" provisions does not necessarily mean that they will be held liable under the AKS. While this is no doubt true, defendants' argument seems more relevant to defending themselves against a motion for directed verdict filed by relator, and it certainly does not constitute a basis for dismissing any AKS claims in the case. The second paragraph of defendants' argument relies upon provisions in the Offering Memorandum which stated MCC's belief that the joint venture was legal and which made clear that investing physicians would not be required to refer patients to MCC. For its part, however, this court would be shocked if the Offering Memorandum did not include language of this sort, since it would not expect sophisticated professionals to openly admit the illegality of their proposed investment or to include blatantly illegal provisions within its prospectus.

As noted above, Dr. Taylor e-mailed his own concerns to relator that, while he was not required to refer patients to MCC, "the more I refer, the more I make." [*Id.*] It thus appears that Dr. Taylor fully understood what frankly seems obvious to this court, namely that human beings will tend to do what is in their own interests, regardless of whether they are required to do so or not. The amended complaint asserts that, rather than rely solely upon economic self-interest to

drive referrals, MCC gave its investor physicians an additional "nudge" in this regard.

Specifically, the amended complaint alleges that:

> 101. MCC also tracked the patients referred to the cancer center by referring physician for over a decade so that they could track whether the investor physicians were sending their patients to MCC. MCC distributed this information to the investor physicians. The December 19, 1994 OIG Special Fraud Alert on Suspect Joint Ventures lists tracking of referrals and distribution of the referral lists to investor physicians as characteristics of a suspect joint venture.

[Amended complaint at 33]. This court would observe that physicians tend to be highly intelligent individuals, and it finds it difficult to believe that any physician who was part of a joint venture which provided economic incentives to refer patients to MCC and which tracked and reported the performance of physicians in this regard could have been in any greater doubt regarding the kind of venture in which they were involved than Dr. Taylor was.

In his email, Dr. Taylor observed that "[i]f the project were totally structured as a fixed payment to the investors, regardless of volume, then that fixes the problem." [*Id.*] This suggestion appears to be in conflict with MCC's decision, openly stated in the Offering Memorandum, not to comply with an AKS safe harbor provision which required "the aggregate compensation payable over the term of the agreement to be set in advance." [*Id.* at 28]. It thus appears to this court that MCC *wanted* its physician investors to have financial skin in the game, and jurors may well conclude that this desire was motivated by a belief that, so incentivized, those physicians would be more likely to refer patients to the clinic. That is precisely the sort of calculus that the AKS and Stark acts were enacted to prevent, no doubt based upon the recognition that, when there is unnecessary "churning" of medical services, the taxpayers will be the ones left to foot the bill.

Taxpayer considerations aside, it seems clear to this court that the decision whether or not to refer a patient to a particular cancer clinic should be based upon medical needs of the patients,

uninfluenced by any profit motive on the part of the referring physician. This court wonders, for example, whether, as a result of the joint venture in this case, plaintiffs who should have been referred to, say, the renowned MD Anderson Cancer Center in Houston, Texas or a better-equipped Mississippi clinic instead found themselves referred to MCC. While this court will assume that MCC has competent oncologists on staff, it believes that there is a reason why referring physicians often determine that certain patients require the services of large clinics with access to greater resources than a local clinic can provide. It seems clear to this court that, particularly in the cancer context, actual lives are at stake when it comes to the referrals of patients, and, that being the case, it takes a very dim view of the nature of the venture in this case, as described in its own Offering Memorandum. Indeed, given the circumstances described above, it does not strike this court as unfair to wonder whether the joint venture in this case actually cost some cancer patients their lives, and it doubts that jurors will look favorably upon that veture.

That brings this court to the numerous motions to dismiss filed by various defendants in this case. Many of the motions strike this court as being almost an attempt to distract it from the central allegations of the case, but the various MRHS defendants do attempt to confront plaintiff's central allegations in their briefing. Specifically, with regard to the argument that the joint venture improperly incentivized referrals, defendants argue that:

> MCC's Operating Agreement also clearly defined how any distributions to the owners should be calculated; *i.e.*, according to each member's ownership percentage, and not tied in any way to the number of referrals (if any) the physician-owners might choose to make to MCC. *See* Exhibit C, Operating Agreement, at 22 ("All cash distributions shall be paid to Members in proportion to their Percentage Interests"); *see also* Exhibit A, Offering Memorandum at 27 ("***Each investor will receive distributions, if any, solely on the basis of such investor's proportionate ownership of MCC and not on the basis of referrals*** by any individual or class of investors or the revenues generated by referrals from such investor"); SAC ¶¶ 130-31 (concession that the "investor physicians were not provided

remuneration based on their specific volume of referrals" and that, instead, "distributions were paid to members in proportion to their percentage interests").

Notwithstanding the foregoing, Studdard's theory of this case is that the Individual Defendants and other physician-investors were "indirectly compensated" from any referrals they chose to make to MCC because those referrals "drove the success of MCC as a whole" – and the more successful MCC was, the greater the distributions that were paid. *Id.* ¶¶ 2, 131. Thus, according to Studdard, the distributions paid to the physician-investors were illegal because they were "kickbacks." *Id.*

[Brief at 6 (emphasis in original)].

Defendants thus argue that MCC's Operating Agreement did not directly incentivize referrals, since it provided for distributions based on each member's ownership percentage. However, as noted above, Dr. Taylor himself clearly did not buy this argument, since he recognized that any referrals increased MCC's overall profits and thus the "pot" from which the distributions are made. Thus, any referrals he made to MCC contributed to the overall profits of the venture and put money in his own pocket. It is unclear to this court why defendants expect this court to accept an argument which one of its own participating physicians did not find persuasive, particularly since it is required, at the Rule 12 dismissal (and Rule 56 summary judgment) stages to view these issues in the light most favorable to plaintiff.

In their brief, the MDHS defendants emphasize the fact that, in his email, Dr. Taylor "acknowledged that 'there are exceptions in a rural community … and there may be one here.'" [*Id.* at 5]. As discussed previously, however, this court's understanding is that the "underserved community" defense is an affirmative one which applies only to plaintiff's Stark claim, and not to its AKS claim. Thus, defendants appear to have no real answer to Dr. Taylor's observation regarding the fundamental AKS implications of an arrangement in which "the more I refer, the more I make." Once again, defendants characterize this "indirect[] compensation" scheme as being plaintiff's central "theory of this case," and this characterization seems quite correct. It thus seems quite significant that defendants appear to have no real answer to that theory, other

than to raise the "underserved community" red herring which does not apply to plaintiff's AKS claim. This court notes that Dr. Taylor sent his email to plaintiff, who he, no doubt, never expected would "turn state's evidence" and file this *qui tam* action. This likely explains Dr. Taylor's decision to offer such a candid evaluation of the MCC venture in his email, unaware that it would later surface in this lawsuit. Now that this has occurred, defendants appear to have no persuasive means of dealing with this troublesome piece of evidence.

Accepting the allegations of the amended complaint as true, Dr. Taylor's email surfaced in this litigation in spite of defendants' efforts to prevent such revelations from occurring. Indeed, the amended complaint alleges that:

> 16. During the same March 10, 2020 meeting, CEO James Hobson cautioned Relator Studdard about putting information about the joint venture in emails or texts because those items could be discoverable in litigation. Hobson further advised Studdard to copy attorneys on emails about the joint venture and put attorney client privilege in the subject line. Hobson said the materials would probably still be discoverable after a "million-dollar legal fight."

*Id.* at 6. Needless to say, this court does not regard this sort of conduct as being consistent with a defendant who is under any illusions about the legality of its actions, and allegations such as these make it even less inclined to grant any defendant in this case a hasty exit from this lawsuit.

Having concluded that defendants lack any real answer to plaintiff's central theory of this case, this court concludes that it is premature, at the Rule 12 stage, to address any attempts by particular defendants to argue that they should be dismissed from the action based on the weakness of plaintiff's claims against them specifically. In seeking to convince this court otherwise, a number of defendants argue that the complaint is not sufficiently specific as to their alleged wrongdoing, either because it insufficiently alleges that they acted with scienter or because it fails to include sufficient details of specific claims which they submitted to Medicare/Medicaid. However, given the basic strength of plaintiff's allegations in this case, the

summary judgment stage is the earliest point at which this court would be willing to consider dismissing any defendants based upon the weakness of the allegations and/or proof against them specifically. In so stating, this court reiterates its view that plaintiff did, in fact, take considerable care in drafting his complaint, but it is unrealistic to expect him to have, at the very start of this case, exhaustive knowledge of the referral and billing practices of each and every defendant. The discovery process exists to allow plaintiffs to fill out the details of their initial complaint in such a manner, and this court anticipates that the discovery process in this case will be a lengthy one.

This court believes that this approach is consistent with Fifth Circuit precedent in this context. Indeed, the Fifth Circuit has held that "to state a claim under the FCA, a plaintiff must allege: (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that is presented to the government." *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010). The materiality element is satisfied if the false statement has a "natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed." *U.S. ex rel. Longhi v. U.S.*, 575 F.3d 458, 468 (5th Cir. 2009). The FCA will impose liability on only those who "knowingly" make a false statement or false record. 31 U.S.C. § 3729(a)(1)(A), (B). "The terms 'knowing' and 'knowingly' mean that a person '(1) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Steury*, 625 F.3d at 267 (quoting 31 U.S.C. § 3729 (b)(A)(i)-(iii)). A "plaintiff must allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

This court further notes that, in *Grubbs*, the Fifth Circuit cautioned against applying

overly strict pleading standards as it relates to allegations of fraud under the FCA, writing that:

> Given the elements of reliance and damages, pleading common law fraud with particularity demands the specifics of the false representation—without the precise contents of the misrepresentation the plaintiff cannot show he relied on the misrepresentation to his detriment. In other words, common law fraud's elements of reliance and damages are intertwined with the misrepresentation and heighten the need for attention to the misrepresentation itself. The False Claims Act, in contrast, lacks the elements of reliance and damages. Rather, it protects the Treasury from monetary injury. Put plainly, the statute is remedial and exposes even unsuccessful false claims to liability. A person that presented fraudulent claims that were never paid remains liable for the Act's civil penalty. It is adequate to allege that a false claim was knowingly presented regardless of its exact amount; the contents of the bill are less significant because a complaint need not allege that the Government relied on or was damaged by the false claim. Thus, a claim under the False Claims Act and a claim under common law or securities fraud are not on the same plane in meeting the requirement of "stat[ing] with particularity" the contents of the fraudulent misrepresentation.
>
> And surely a procedural rule ought not be read to insist that a plaintiff plead the level of detail required to prevail at trial. The False Claims Act is a civil provision and under section (a)(1) a plaintiff must prove presentment by a preponderance of the evidence. Fraudulent presentment requires proof only of the claim's falsity, not of its exact contents. If at trial a qui tam plaintiff proves the existence of a billing scheme and offers particular and reliable indicia that false bills were actually submitted as a result of the scheme—such as dates that services were fraudulently provided or recorded, by whom, and evidence of the department's standard billing procedure—a reasonable jury could infer that more likely than not the defendant presented a false bill to the government, this despite no evidence of the particular contents of the misrepresentation. Of course, the exact dollar amounts fraudulently billed will often surface through discovery and will in most cases be necessary to sufficiently prove actual damages above the Act's civil penalty. Nevertheless, a plaintiff does not necessarily need the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted. To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.

*Grubbs*, 565 F.3d at 189–90.

The Fifth Circuit thus made it clear that it would be unrealistic to expect the same level of

proof in a complaint as would be required to prevail at trial, and this certainly makes sense to this

court. This court would add that each case is unique, and the overriding objective in each one is

to attempt to do justice. In this vein, this court might be inclined to take a stricter view of how

much specificity was required in pleadings in a case where it doubted the basic validity of the plaintiff's claims. In this case, by contrast, this court looks with considerable suspicion upon any defendant who profited from an investment founded upon the Offering Memorandum in this case, and it believes that MCC's conscious decision not to make inquiries to resolve doubts regarding the basic legality of the venture ties in quite effectively with *Steury*'s holding that "acts in deliberate ignorance of the truth or falsity of the information" may suffice to demonstrate that a particular defendant acted "knowingly" within the context of the FCA's fraud requirement.

This court believes that Dr. Taylor's email makes it even more difficult for individual defendants to argue that the complaint fails to make plausible allegations regarding their knowledge of the potential illegality of the MCC venture. In so stating, this court would submit that Dr. Taylor's observation that "the more I refer, the more I make" and his concerns regarding whether this arrangement was essentially a kickback does not represent some unique insight on his part. To the contrary, Dr. Taylor's observation strikes this court as being a rather obvious one under the circumstances, and, that being the case, it believes that it would be wrong to require plaintiff to produce similar "smoking-gun" emails from other defendants in this case. This court's strong inclination not to dismiss this case based upon insufficient allegations in the pleadings on this issue is strengthened by plaintiff's allegation that MCC was shut down after one of its executives had concluded, and warned others, that the venture actually *was* illegal.

This court further believes that it would be wrong, under the *Grubbs* standard, to dismiss what appear to be entirely viable FCA claims based upon plaintiff's alleged failure to make sufficient allegations in the Amended Complaint regarding specific referrals and/or claims for reimbursement from the federal government. In so stating, this court would emphasize that it is dealing with alleged referrals by Corinth physicians and Corinth medical clinics to the local

cancer clinic.  Under these circumstances, it would be surprising indeed if a particular physician

defendant in this case had never made referrals to MCC or sought reimbursement for treatment

from Medicare or Medicaid, but, if that is the case, then it is something which any defendant may

raise on summary judgment following discovery.  In this vein, this court would caution plaintiff

that he should not seek to overplay his hand in this regard, and he should voluntarily dismiss any

defendants as to whom he lacks a good faith basis to assert liability.  If plaintiff fails to do so,

then he will lose a good bit of credibility with this court, and this might conceivably lead to it re-

evaluating its inclinations stated in this order.

With this caveat, this court notes that the Amended Complaint does, in fact, provide

examples of referrals made by numerous defendant doctors in this case.  For example, the

Amended Complaint alleges that:

> 147. By way of example, and to provide an even greater indicia of reliability regarding this
> scheme, Relator identifies the following referrals to MCC some of which were Medicare,
> Medicaid and Tricare/Champus beneficiaries:
> a. Physician Investor, Dr. Stephen Besh, referred 21 patients to another
> physician investor, radiation oncologist Dr. Daniel Schroyer, at
> MCC during the time period from January 1, 2013 through
> September 18, 2019. These patients were referred for radiation
> oncology services at MCC. They are recurring patients that were
> registered on their first visit and if treatment went into another
> month, they were registered again for the new month. The following
> is each of the patient's first registration date on file and are examples
> of those patient referrals:
> - Patient D.B, Account Number Vxxxxxxx9730
> Registered 06/03/2013
> - Patient G.B, Account Number Vxxxxxxx2663
> Registered 08/28/2013
> - Patient J.B., Account Number Vxxxxxxx1145
> Registered 06/09/2014
> - Patient C.D., Account Number Vxxxxxxx9165
> Registered 08/01/2013
> - Patient P.H., Account Number Vxxxxxxx4546
> Registered 04/23/2013
> - Patient P.M., Account Number Vxxxxxxx4756

Registered 05/01/2014

b. Physician Investor, Dr. Michael Peery, referred 6 patients to another
physician investor, radiation oncologist Dr. Daniel Schroyer, at MCC during the time
period from March 1, 2013 through September 18, 2019. They are recurring patients that
were registered on their first visit and if treatment went into another month, they were
registered again for the new month. The following is each of the
patient's first registration date on file and are examples of those
patient referrals:
- Patient J.C., Account Number Vxxxxxxx9265
Registered 04/01/2014
- Patient B.P., Account Number Vxxxxxxx3548
Registered 04/01/2013
- Patient P.R., Account Number Vxxxxxxx8581
Registered 03/01/2013
- Patient R.R., Account Number Vxxxxxxx1247
Registered 06/02/2014
- Patient C.R., Account Number Vxxxxxxx3530
Registered 08/01/2013
- Patient C.T., Account Number Vxxxxxxx3226
Registered 03/04/2014

[Amended complaint at 45-46].

Once again, these are merely examples of allegations of specific referrals on the part of

defendant physicians in the Amended Complaint, eight pages of which are devoted to allegations

similar to the ones above. It thus seems clear that the sixty-eight (68) page Amended Complaint

in this case is far from the bare-bones document which defendants seem to regard it as being, but

this does not mean that it cannot be further improved following discovery. It does appear that

the Amended Complaint's allegations are more specific against some defendants than others, and

this court accordingly directs plaintiff to attempt to buttress its proof in this regard, where

needed, during discovery and to file another amended complaint which improves further upon its

allegations in this regard. In cases where the required proof is found lacking during discovery as

to any defendant(s), then plaintiff should drop his claims against those defendant(s) in the

amended pleading. This court will then consider the results of any such amended complaint in

any summary judgment motions following discovery, but it would be improper to attempt to resolve these issues at this juncture, before discovery has even been performed.

It appears to this court that, even on summary judgment, defendants may face a difficult burden in seeking to persuade it to prevent a jury from considering their actions. In so stating, this court first emphasizes that, at both the Rule 12 dismissal and Rule 56 summary judgment stage of proceedings, it is required to view the facts in the light most favorable to plaintiff, as the non-moving party. That being the case, if there appears to be some doubt regarding whether plaintiff has submitted sufficient proof of say, referral or billing activities by a particular defendant, then this court will be required to view the proof in the light most favorable to plaintiff in evaluating this issue. Moreover, assuming that defendants fail to change this court's presently dim view of the joint venture in this case, then this will inform its decision regarding whether it would be unfair to subject a particular defendant who profited from that venture to the burdens of trial. This does not mean, of course, that this court will tolerate seeing, say, a clerk in the mail room of a Corinth oncology clinic dragged into this litigation, but, where the proof suggests that a particular defendant profited from the legally and morally questionable venture in this case and had a significant role in it, then this court may well be inclined to err on the side of allowing a jury to evaluate their conduct, even if it suspects that jurors may rule in their favor at trial.

This court further notes that, based on the parties' briefing, there appears to be a considerable degree of inconsistency in the results reached by various trial and appellate courts in this context, which makes it difficult to predict exactly how the Fifth Circuit would view some of the issues in this case. In light of this uncertainty, judicial economy considerations arguably support it erring on the side of having jurors make too many findings of liability, rather than too

few. In so stating, this court notes that, if it is found on appeal to have improperly dismissed one of the defendants in this case, then the only remedy for the Fifth Circuit would be to remand for an entirely new trial. Given the likely length of any trial in this case, this would be highly burdensome to both sides. If, by contrast, the Fifth Circuit finds that this court should have dismissed a particular defendant from this case, then it may simply strike any jury findings of liability against that defendant, without the necessity of a re-trial.

In this case, these judicial economy considerations may work hand-in-glove with its basic view, stated above, regarding the fairness of requiring those who profited from the venture in this case to explain their actions to a jury. Indeed, it may be regarded as karma that those who profited from a joint venture which quite consciously avoided making too many inquiries regarding its legality at the outset should be required to submit themselves to the judgment of jurors after the fact. In so stating, this court reiterates that defendants concede that MCC was dissolved based upon concerns regarding its legality, and this court therefore looks with skepticism upon any attempts by those who profited from this dubious venture to avoid subjecting themselves to any fact-finding process regarding its legality. This court believes this to be true even if the jury's opinion ends up being a favorable one as to some or all of the defendants in this case.

This court further suggests that, in light of the observations stated above, defendants may wish to consider the possibility that, when plaintiff turned state's evidence by filing a *qui tam* action in this case, he caught them red-handed in conduct and admissions which they will find it very difficult to explain to a jury. It is not clear to this court that additional discovery and legal bills will change the basic facts in this regard, and it accordingly recommends that defendants consider exploring a settlement in this matter. In so stating, this court notes its view that, given

the nature of the joint venture in this case, and the harm which it may have caused to both taxpayers and local cancer patients, it seems doubtful that a jury will look any more favorably upon it than this court does.

Perhaps recognizing the strength of the claims against them, defendants throw a "Hail Mary" pass by seeking for this court to declare the FCA's *qui tam* provisions unconstitutional. [Brief at 22]. This court declines this invitation, even though it has expressed serious reservations regarding the harshness of the FCA and its treble damages provision in certain cases. *See, e.g. United States ex rel. Jehl v. GGNSC Southaven, LLC*, No. 319CV00091, 2021 WL 2815974, at *3 (N.D. Miss. July 6, 2021). Indeed, while this court believes that *qui tam* actions have a serious potential to be abused by profit-seeking plaintiffs, it appears that the FCA may be playing a positive role in this case. In so stating, this court notes that, while the federal government has the authority to prosecute violations of the AKS and Stark laws, some of the most powerful evidence in this case, such as Dr. Taylor's email to plaintiff, appear to have come to light because plaintiff "saw dollars signs" and decided to file this action. This court finds the prospect that plaintiff will profit from this action to be rather distasteful, since, as an MCC executive, he was up to his neck in the venture and seems poised to profit from it both on the way up and on the way down. Still, this court believes that, as with plea bargains in the criminal context, the greater interests of justice sometimes require that courts hold their noses and provide favorable treatment to individuals who appear to have committed serious wrongdoing. This court therefore declines defendants' invitation to declare the FCA unconstitutional, and their motions to dismiss will be denied.

It is therefore ordered that the motions to dismiss filed by the various defendants in this case are denied.

This, the 1st day of August, 2024.

/s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI