**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| **STATE OF TENNESSEE ex. rel. MARK** ) | |
| **STUDDARD,** ) | |
| **Relator-Plaintiff** ) | |
| ) | |
| **vs.** ) | **Civil Action No. 1:20-cv-025-MPM-DAS** |
| ) | |
| **MAGNOLIA REGIONAL HEALTH** ) | |
| **SERVICES, INC., et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**STIPULATED PROTOCOL FOR PRODUCING DOCUMENTS AND**
**ELECTRONICALLY STORED INFORMATION ("ESI")**

**I.      PURPOSE**

This Stipulated Protocol for Producing Documents and Electronically Stored Information

(the "Order") shall govern the production of documents and electronically stored information

("ESI") by the parties and their counsel of record, whether they currently are involved, or become

so in the future (collectively, the "Parties") in the above captioned action, and any and all cases

consolidated or coordinated with it.

**II.      GENERAL**

Nothing in this Order is intended to be an exhaustive list of or limitation on the discovery

obligations or rights of a Party requested to produce documents or ESI ("Producing Party") or a

Party requesting documents or ESI ("Requesting Party"). Except as specifically set forth herein,

this Order does not: (a) alter or affect the applicability of the Federal Rules of Civil Procedure

("Federal Rules") or any Local Rules of the District Courts ("Local Rules"), as applicable; (b)

address, limit, determine, or affect the relevance, discoverability, or admissibility as evidence of

1

any document or ESI, regardless of whether the document or ESI is to be preserved, is preserved, or is produced; or (c) alter or affect the objections to discovery available under the Federal Rules. The purpose of this Order is to facilitate the exchange of ESI and hard copy documents in an efficient manner and in accordance with the Federal Rules. By stipulating to this Order and agreeing to produce documents in a particular form or forms, no Party waives any objections to producing any particular document or category of documents on any grounds whatsoever.

The procedures and protocols outlined in this Order govern the production of documents and ESI by all Parties. The Parties agree to promptly alert all other Parties concerning any technical problems associated with complying with this Order and, to the extent that a Party believes that compliance with this Order imposes an undue burden disproportionate to the needs of the case, the Party claiming such a burden shall inform all other Parties in writing of the asserted burden, describing it (and any potential solutions) with specificity, and the Parties shall thereafter promptly meet and confer in an effort to resolve the issue. All productions made pursuant to this Order are subject to any confidentiality, preservation, protective, and/or privilege orders entered in the litigation.

## III.    DEFINITIONS

a.    **"Confidentiality Designation"** means the legend affixed to Documents or ESI for confidential or highly confidential information as defined by, and subject to, the terms of the Protective Orders agreed to and/or entered by the Court in this litigation.

b.    **"Document"** is defined to include hard-copy documents, electronic documents, and ESI as defined herein.

c.    **"Electronic Document or Data"** means documents or data existing in electronic form at the time of collection, including but not limited to: e-mail or other means of electronic

2

communications, word processing files (*e.g.*, Microsoft Word), computer slide presentations *(e.g.,* PowerPoint or Keynote slides), spreadsheets (*e.g.*, Excel), and image files (*e.g.*, PDF).

      d.      **"Electronically stored information"** or **"ESI"** as used herein includes Electronic Documents or Data, and computer-generated information or data, stored in or on any storage media located on computers, file servers, disks, tape, USB drives, or other real or virtualized devices or media.

      e.      **"Extracted Full Text"** means the full text that is extracted electronically from native electronic files, and includes all header, footer, and document body information.

      f.      **"Hard-Copy Document"** means documents existing in paper form at the time of collection.

      g.      **"Hash Value"** is a unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm applied to the characteristics of the data set. The most commonly used algorithms, known as MD5 and SHA, will generate numerical values so distinctive that the chance that any two data sets will have the same Hash Value, no matter how similar they appear, is less than one in one billion.

      h.      **"Load files"** means an electronic file containing information identifying a set of paper-scanned images, processed ESI, or native format files, as well as the corresponding Extracted Full Text or OCR text files and, to the degree available, containing agreed-upon extracted or user-created metadata, as well as information indicating unitization (i.e., document breaks and document relationships such as those between an email and its attachments) used to load that production set into the document review platform of the Party receiving a production ("Receiving Party"), and correlate its data within that platform. A load file is used to import all image, native, and text files and their corresponding production information into a document

database. The Party producing ESI or documents (the "Producing Party") shall produce a load file for all produced documents with each particular production in accordance with Section VII(e) and other specifications provided herein.

     i.     **"Media"** means an object or device, real or virtual, including but not limited to a disc, tape, computer, or other device on which data is or was stored.

     j.     **"Metadata"** means: (i) information embedded in or associated with a native file that describes the characteristics, origins, usage, and/or validity of the electronic file; (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system, (iii) information, such as Bates numbers, redaction status, privilege status, or confidentiality status created during the course of processing documents or ESI for production, and (iv) information collected during the course of collecting documents or ESI, such as the name of the media device on which it was stored, or the custodian or noncustodial data source from which it was collected. Nothing in this order shall require any party to manually populate the value for any metadata field.

     k.     **"Native Format"** or **"native file"** means the format of ESI in which it was generated and/or used by the Producing Party in the usual course of its business and in its regularly conducted activities. For example, the native format of an Excel workbook is an .xls or .xslx file.

     l.     **"Optical Character Recognition"** or **"OCR"** means the optical character recognition technology used to read the text within electronic images of paper Documents and create a file containing a visible, searchable text format of such Documents.

     m.     **"Producing Party"** means the Party producing ESI or documents.

n.     **"Searchable Text"** means the native text extracted from an electronic document and any Optical Character Recognition text ("OCR text") generated from the electronic image of a paper Document.

## IV.    IDENTIFICATION OF DOCUMENTS AND ESI

a.     The Parties agree to meet and confer prior to production to discuss the Producing Party's search methodologies, including (i) the identity of search terms and custodians, data sources (including email) containing potentially relevant ESI for potential collection, review, and production; (ii) parameters for scoping the review and production efforts (*e.g.*, application of date ranges, de-NISTing, etc.); (iii) use and identification of tools or techniques to collect ESI for responsiveness review (*e.g.*, technology assisted review "TAR" or other advanced analytics tools); (iv) the identification and production of documents and ESI from sources that do not require the use of search terms, tools, or techniques; (v) the method each Party proposes to use to identify and de-duplicate documents, and any exceptions to such de-duplication the Party proposes to implement; and (vi) the treatment of non-responsive documents within parent-child families.

b.     The Parties further agree to meet and confer to the extent that any Party asserts that this Stipulation imposes any undue burden or expense on any Plaintiff or Defendant with respect to its response to any particular discovery request.

c.     Nothing in this Stipulation shall be deemed to be a waiver of any Party's right to reasonably seek agreement from the other Parties, or a Court ruling, to modify proposed or previously agreed-to search terms, techniques, or tools.

## V.    PRESERVATION OBLIGATIONS

a.     The Parties agree to abide by the obligations set forth in Fed. R. Civ. Proc. 26 and the Local Rules. The Parties have taken and shall continue to take reasonable steps to ensure the preservation of documents, data, and tangible things relevant to claims or defenses in this Action.

b.     By preserving documents or ESI for the purpose of this action, the Parties are not conceding that such material is discoverable, nor are they waiving any claim of privilege.

(i)     ESI WHICH DOES NOT NEED TO BE PRESERVED

Consistent with the proportionality standard, and absent a Party's specific written notice for good cause, the following categories of ESI need not be preserved:

a.     Deleted data, fragmented data, unallocated/slack-space data, or other data only accessible by the data being rebuilt through forensic means.

b.     Temporary data stored in a computer's random-access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system.

c.     Online access data such as temporary Internet files, cache, and cookies.

d.     Data in metadata fields that are updated automatically and frequently, such as last opened dates.

e.     Data duplicated in any electronic backup system for the purpose of system recovery or information restoration, including but not limited to continuity of operations systems, and data or system mirrors or shadows, if such data are routinely purged, overwritten or otherwise made not reasonably accessible in accordance with an established routine system maintenance policy.

f.     Server, system, or network logs.

g.     Electronic data temporarily stored by laboratory equipment or attached electronic equipment, provided that such data is not ordinarily preserved as part of a laboratory report.

6

h. Data remaining from systems no longer in use that is unintelligible or that is duplicated on current systems.

i. Other forms of ESI whose preservation the parties agree requires extraordinary affirmative measures that are not utilized in the ordinary course of business or standard ESI practices. If a party intends to utilize this subsection, then the party must provide a written notice to the Parties, describing the information they are not preserving, the burden associated with the preservation as well as the reasons why it is believed the information or evidence is accessible by a different means.

(ii) INACCESSIBLE ESI

The following categories of ESI are presumed to be inaccessible within the definition of Federal Rule of Civil Procedure 26(b)(2)(B):

(iii) Back-up data that are substantially duplicative of data that are more accessible elsewhere.

(iv) Back-up tapes or other long-term storage media that were created strictly for use as a data back-up medium.

(v) Electronic data (*e.g.*, call logs, email, calendars, contact data, notes, etc.) sent to or from mobile devices (*e.g.*, iPhone, iPad, Android, and Blackberry devices), if a copy of such electronic data is saved elsewhere that is accessible (such as on a server, laptop, desktop computer, or "cloud" storage).

(vi) Disaster-recovery backup data. Absent a showing of good cause, disaster-recovery backup data shall be considered to be not reasonably accessible.

(vii) Data remaining from systems no longer in use that is unintelligible on systems in use and cannot be accessed or restored by systems currently licensed or owned.

7

Nothing herein is intended to suggest that any sources of information or data not specifically excluded here are otherwise discoverable or required to be searched. Unless otherwise agreed to or ordered by the Court, the Parties are not required to obtain a forensic image of the preserved data as long as the native files and associated metadata are preserved. Further, and unless otherwise agreed to or ordered by the Court, the Parties are not required to collect data from foreign jurisdictions outside of the United States before exhausting domestic sources.

## VI.    DEDUPLICATION

a.    To the extent exact duplicate documents reside within a Party's ESI data set, the Party shall produce only a single, de-duplicated copy of a responsive document. "Exact duplicate" shall mean bit-for-bit identity of the document content with exact hash value matches; so-called "near duplicates" will not be included within this definition.

b.    To the extent a Party de-duplicates its documents, it shall de-duplicate stand-alone documents or entire document families in their ESI sources by the use of MD5, SHA-1, or SHA256 hash values. Where any such documents have attachments, hash values must be identical for both the document plus-attachment (including associated metadata) as well as for any attachment (including associated metadata) standing alone.

c.    A Producing Party  shall de-duplicate ESI, where possible, including where appropriate across custodians, and populate a field of data that identifies each custodian who had a copy of the produced document (the "Duplicate Custodian" field) in addition to a separate field of data identifying the custodian whose document is produced; where applicable, such de-duplicated documents shall be deemed produced from the custodial files of each such identified custodian for all purposes in this litigation, including for use at deposition and trial. Where applicable, a Producing Party shall use a uniform description of a particular custodian across productions. Multiple custodians in the "Duplicate Custodian" field shall be separated by a

semicolon. The Producing Party agrees that the presence of an individual's name contained in the "Duplicate Custodians" field in the metadata for a particular document indicates that the individual possessed that document in his/her custodial file. In the event that a Producing Party is unable to de-duplicate, the Producing Party shall notify the other parties prior to production so that a working solution can be identified.

      d.      No Party shall identify and/or eliminate duplicates by manual review or some method other than by use of the technical comparison using MD5, SHA-1, or SHA256 hash values outlined above. However, in order to reduce the volume of entirely duplicative content within email threads, the Parties may utilize commercially available "email thread suppression" tools.

      e.      Hard-Copy Documents shall not be eliminated as duplicates of ESI.

      f.      If the Producing Party makes supplemental productions following an initial production, and the supplemental production contains exact duplicates, that Party, to the extent possible or feasible for such Party, shall provide with such a supplemental production an overlay file to allow the Receiving Party to update the "Duplicate Custodian" field. The overlay file shall include all custodians listed in the "Duplicate Custodian" field in prior productions and any custodians newly identified in the current supplemental production. In the event that it is not possible or feasible to de-duplicate supplemental productions following an initial production, the Producing Party shall notify the other parties prior to production so that a working solution can be identified.

## VII.    PRODUCTION FORMAT AND PROCESSING SPECIFICATIONS

      a.      <u>Standard Format</u>.

Unless otherwise specified in Section 7(b) or pursuant to Section 7(h) below, the Parties shall produce documents in tagged image file format ("TIFF"). TIFFs of ESI shall convey the same information and image as the original document, including all commenting, versioning, and

formatting that is visible in any view of the document in its native application. All hidden text will be expanded, extracted, and rendered in the TIFF file and, to the extent possible, the Producing Party will instruct its vendor to force off Auto Date. Any TIFFs produced shall be single-page, 300 DPI, Group IV TIFF files. After initial production in image file format is complete, a party must demonstrate particularized need for production of ESI in its native format.

      b.    <u>Native Format</u>.

Except as provided by Section 7(h) below, the Parties shall produce all spreadsheets, *i.e.*, Excel documents, audio files, computer slide presentations, *i.e.*, PowerPoint presentations, video files, and other file types that cannot be accurately represented in TIFF format in native format, provided, however, that the Parties will meet and confer regarding appropriate format of production for databases and structured data (*e.g.*, Microsoft Access, Oracle, SaS, or other proprietary databases). For each document produced in native format, a responding Party shall also produce a corresponding cover page in TIFF image format, specifying that the document has been "produced in native format" and endorsed with the Bates Number and Confidentiality Designation, if applicable, which will be inserted into the image population in place of the native file. When the native file is produced, the Producing Party shall preserve the integrity of the electronic document's contents, *i.e.,* its original formatting and metadata.

      c.    <u>Color</u>.

Documents containing color shall be produced in color. Documents produced in color will be produced in TIFF or JPEG format.   In the event a Producing Party cannot produce a document in color, the Producing Party shall notify the other parties.   The other parties shall be allowed to request production of a document containing color where necessary to interpret the content of the document.

d.    Embedded Objects.

If documents contain embedded files or objects, the Parties shall extract the embedded files or objects as separate documents and treat them like attachments to the document to the extent reasonably possible. Images embedded in emails need not be extracted and produced separately.

e.    Load Files.

Each production of ESI and Documents shall be accompanied by Concordance format load files (.dat) and Opticon-format image lead file (.opt). The .dat file, using standard Concordance delimiters, should contain a field with the full path and filename to files produced in native format and also containing metadata fields identified in Appendix A, to the extent the information is available in the original ESI file and can be extracted without unreasonable burden using standard litigation support processing platforms (except for vendor generated fields related to the production, such as "BEGDOC", "ENDDOC", bases for redaction, and Confidentiality Designations).

f.    .Txt Files.

For all documents containing extracted full text or OCR text, the Producing Party shall provide searchable document level .txt files (named using the Bates start "BEGDOC"), which shall reside in either the same file directory as the images for such documents or in a separate directory with a file for cross-referencing.

g.    Bates Numbering and Other Unique Identifiers.

Every item or file of ESI that is produced shall be identified by a unique page identifier ("Bates Number") and a Production Volume Number for any storage device (*e.g.*, CD, USB, hard drive) containing such files. All Bates numbers will consist of an Alpha Prefix, followed by a numeric page index. There must be no spaces in any Bates number. Any numbers with fewer than

8 digits will be front padded with zeros to reach the required 8 digits. All ESI produced in TIFF format shall contain a unique Bates Number on each page of the document, electronically "burned" onto the image at a location that does not obliterate, conceal, or interfere with any information from the source document. If a member of a document family that has otherwise been determined to be responsive cannot be technically processed (*e.g*., unsupported file format, file corruption, inaccessible password-protected document), those technical problems shall be identified and disclosed to the Receiving Party by production of a Bates-labeled slip sheet that states "Technical issue—file cannot be processed,'' and identifying in the production's accompanying DAT file any document requiring a technical issue slipsheet; the associated metadata for the file with the technical problem shall be preserved and, where technically possible, produced. A Receiving Party thereafter may raise with the Producing Party any questions or concerns, and the Parties shall meet and confer to attempt to resolve any issues.

  h. <u>Hard-Copy Documents</u>.

  Except as otherwise set forth in this paragraph, the Parties agree that responsive paper documents shall be converted to single-page TIFF files and produced following the same protocols set forth in Section 7(a) above, including the production of OCR text that is generated to make such documents searchable. Generally, all paper documents will be scanned and produced electronically, unless a Party establishes good cause for making such documents available via paper and reasonable access is provided to the opposing Party to review the documents directly. In scanning all Hard-Copy Documents, Hard-Copy Documents should be logically unitized. Accordingly, distinct documents should not be merged into a single record, and single documents should not be split into multiple records. In the case of an organized compilation of separate documents (for example, a binder containing several separate documents behind numbered tabs),

each of the Hard-Copy Documents should be separately scanned, but the relationship among the documents in the compilation should be reflected in the proper coding of the beginning and ending documents and attachment fields. The Parties will make their best efforts to unitize the documents correctly. Hard-Copy Documents should not be de-duplicated unless a need arises and only after discussion with the Parties. Producing Hard-Copy Documents as provided herein does not change their character from Hard-Copy Documents into ESI. For Hard-Copy Documents, the Parties need only populate the following metadata fields: "BEGDOC," "ENDDOC," "PROD VOLUME," "CUSTODIAN," "SOURCE," "CONFIDENTIAL," "REDACTION," and "COMPANY" fields, as well as "BEGATTACH" and "ENDATTACH" fields where applicable.

> i. <u>Confidentiality Designation</u>.

To the extent any Document or ESI (or portion thereof) produced as a TIFF image in accordance with this Stipulation is designated as Confidential, Highly Confidential or Highly Confidential—Attorneys' Eyes Only under any Protective Order agreed and/or entered in this litigation, the Producing Party will brand the required Confidentiality Designation in a corner of any TIFF images representing the produced item and in a consistent font type and size that does not obscure any part of the underlying image or Bates number, to the extent possible.

> j. <u>Privilege Logs</u>.

Pursuant to Federal Rule of Civil Procedure 26(b)(5), if a party withholds or redacts requested information or materials based upon the assertion of a privilege, or application of the work-product doctrine, that party shall provide a privilege log describing each document or thing withheld or redacted in sufficient detail to reasonably permit the party seeking discovery to assess the validity of the privilege. This includes:

(i)      a unique identifying number (separate from any Bates numbering), along with a separate column identifying the Bates number(s) of a document claimed to be privileged if produced in redacted form or produced as a Bates-stamped slip sheet;

(ii)      the subject of the document, based on the Subject field (or other similar category) from electronically generated metadata associated with the document, to the extent applicable and reasonably available, except that a party may redact some or all of this information to the extent that it has a good faith belief that it would reveal privileged information;

(iii)      the date of the document to the extent reasonably ascertainable;

(iv)      the From (or Author), To, CC, and BCC information for the document based on electronically generated metadata associated with the document, to the extent applicable and reasonably available. To the extent that Listserv or group email addresses are provided (as a From (or Author), To, CC, or BCC), the Producing Party shall work in good faith to identity, upon request, individuals and/or groups of individuals which make up such Listserv's or group emails. For emails, the parties may identify this information based on the metadata of the topmost email in the chain;

(v)      the specific privilege asserted;

(vi)      the factual basis for the privilege, including a description of the nature of the document communication, or tangible thing in sufficient detail to reasonably permit the party seeking discovery to assess the validity of the privilege;

(vii)      indication (*e.g.*, with an asterisk) of which individual(s) on the privilege log (authors, senders, and recipients) are attorneys or other legal personnel giving rise to the privilege. If an attorney(s) or other legal personnel is/are not within the metadata of the

14

most recent email, the Producing Party will include the name(s) of any such individual(s) within the description or comparable field that identifies such legal nexus; and

(viii)    the name of or other identifying information as to the source of the document (listing of the primary custodian constitutes sufficient identifying information).

k.    <u>Format and Timing of Privilege Logs</u>.

The parties shall produce their privilege logs in Excel format that allows for text searching, sorting, and organization of data, and shall be produced either: (a) in a cumulative manner, so that each subsequent privilege log includes all privilege claims from prior logs; or (b) in installments using a consistent format so that the installments can be merged into a cumulative Excel spreadsheet by the receiving parties. Within thirty (30) days of each production, the parties shall produce their privilege logs for that production.

l.    <u>Logging Redactions</u>.

Redaction of non-privileged information shall not be logged, provided that the party specifies the basis of the redactions on the production image or in the metadata. This section shall not be construed to require a party to redo its privilege logs, redactions, or production of documents initially produced in other litigations that were reproduced in this action.

m.    <u>Redactions</u>.

A Party may use redactions to protect attorney-client or work product privileges as permitted by statute, code, rule, this Stipulation or any Protective Order agreed and/or entered in this litigation. Other than as permitted by this Stipulation or any Protective Order agreed and/or entered in this litigation, no redactions for relevance may be made within a produced document or ESI item. Any redactions shall be clearly indicated on the face of the document (*e.g.*, in black blocks, not white blocks), with each redacted portion of the document stating that it has been

15

redacted and the basis for the redaction. Where a responsive document contains both redacted and non-redacted content, the Producing Party shall produce the remainder of the non-redacted portions of the document and the text/OCR corresponding to the non-redacted portions. Email header information (*e.g.*, date, subject line, etc.) should not be redacted unless it is independently privileged. The production of a document in a redacted form does not affect the Producing Party's obligation to timely assert and substantiate the assertion of privilege over the content in a privilege log. The Parties shall honor reasonable requests for the production of particular redacted documents in other formats where the TIFF or JPEG image is not reasonably usable.

      n.      <u>Parent-Child Relationships</u>.

The Parties acknowledge and agree that parent-child relationships within a document family (the association between an attachment and its parent document or between embedded documents and their parent) shall be preserved. Responsive nonprivileged electronic documents attached to an email or embedded within other electronic documents and hard-copy documents attached or appended to hard-copy documents must be mapped to their parent by the beginning Bates number and immediately follow that parent file in the sequence of the production. Email attachments and embedded files or links "BEGATTACH" and "ENDATTACH" fields listing the unique beginning Bates number of the parent documents and ending number of the last attachment must be populated for each child and parent document.

      o.      Inclusive Email Production (Threading)

The Parties shall, to the extent possible, use email thread analysis[1] to reduce the volume of emails reviewed and produced, provided that the produced emails include all responsive

---

[1] Where multiple email messages are part of a single email chain or "thread," a party is only required to produce the most inclusive messages ("Last in Time Email") and need not produce

information from a thread, including attachments (regardless of their placement in the email thread) and bibliographic information. When producing the most-inclusive email in a thread, the parties need to not also produce lesser-included emails in the thread. If the Producing Party has a technological limitation which prevents them from using email thread analysis, the Producing Party must identify family relationships in the load file.

p.   <u>OCR</u>.

Production load files must contain OCR documents. If the Producing Party has a technological limitation, the load file must contain the text of the documents in the production. OCR software shall be set to the highest quality setting during processing.

q.   <u>Deviation from Production Specifications</u>.

If a particular document or category of documents warrant a different format, including where documents were retained or stored by a Party in a format lacking metadata, the Parties will cooperate in good faith to arrange for a mutually acceptable production format.

r.   <u>Productions from Other Proceedings</u>.

The production of Documents made by the Parties in other civil investigations, factually related matters, and/or administrative actions by federal (including Congressional) state, or local government entities shall be made in the format in which they were previously produced, including any previously produced metadata, load files, and accompanying text files. This ESI protocol shall not be construed to require a party to revise its privilege logs, redactions, or productions of

---

earlier, or less inclusive email messages or "thread messages" that are fully contained, including attachments, and including identical senders and recipients, including the Last In Time Email. Only email messages for which the parent document and all attachments are contained in the Last in Time Email will be considered less inclusive email messages that need not be produced.

documents initially produced in other civil investigations, litigations, and/or administrative actions that are reproduced in this action.

s.      Password Protection.

In the event any Document or ESI (or portion thereof) produced is password protected, the Producing Party shall make all reasonable efforts to provide the password needed to access the document or ESI.

t.      Use at Deposition.

Any Document produced in native format that a Party identifies and/or marks as an exhibit at a deposition must include as part of that identification or exhibit the produced corresponding cover page in TIFF image format, endorsed with the document's Bates Number and Confidentiality Designation, as described in Section 7(b) above, absent exigent circumstances. If a Party identifies and/or marks a Document as an exhibit at a deposition without the corresponding cover page as required by this provision, the Party shall note the Bates Number and Confidentiality Designation of the Document on the record. Where the Party identifying and/or marking the exhibit is unable to do so during the deposition, the exhibit shall be treated during the deposition as Highly Confidential - Attorneys' Eyes Only and designated as such until the Bates Number is identified, and the proper Confidentiality Designation can be determined.

## VIII.   PRODUCTION MEDIA

The Producing Party shall produce documents on readily accessible, computer or electronic media, including CD-ROM, DVD, external hard drive (with standard PC compatible interface), via secure FTP site, or such other readily accessible computer or electronic media as the Parties may agree (the "Production Media"). Each piece of Production Media shall be encrypted and assigned a production number or other unique identifying label (''Production Volume Number") corresponding to the date of the production of documents on the Production Media as well as the

sequence of the material in that production, and shall include (a) the name and number of this action; (b) the identity of the Producing Party; (c) the production date; (d) the Bates Number range of the materials contained on such Production Media item; and (e) the Production Volume Number of the Production Media. The Producing Party shall accompany all document productions with a transmittal cover letter identifying by Bates number the documents produced. If the Producing Party produces documents via secure FTP site, the Producing Party shall specify the date through which the materials will remain available via the secure FTP site and the Producing Party shall, within a reasonable time, accommodate requests from another Party or Parties that documents be reposted to the FTP site.

## IX.    COST SHIFTING

The costs of production pursuant to this Stipulation shall be borne by the Producing Party. However, in agreeing to this Stipulation, no Party waives or relinquishes any right or interest it may have to seek cost shifting or apportionment for the costs of electronic discovery.

## X.    THIRD-PARTY ESI

a.    Following the execution of this ESI protocol and the Protective Order, a Party that issues a non-Party subpoena (the "Issuing Party") shall include a copy of this Stipulation and any Protective Order entered in this action with the subpoena and include the following language: The Parties to this action have requested that third-Parties produce documents in accordance with the specifications set forth herein.

b.    The Issuing Party shall produce a copy to all other Parties of any documents and ESI (including any metadata) obtained under subpoena to a non-Party.

c.    If the non-Party production is not Bates-stamped, the Issuing Party will endorse the non-Party production with unique Bates prefixes and numbering scheme prior to reproducing them to all other Parties.

## XI.   BEST EFFORTS COMPLIANCE AND DISPUTES

The Parties agree to use their best efforts to comply with and resolve any differences concerning compliance with any provision(s) of this Stipulation. If a Producing Party cannot comply in a particular circumstance with this Stipulation, to include limitations or restrictions arising from available e-Discovery software, such Party shall promptly inform the Receiving Party in writing why compliance with the Stipulation is not reasonable or feasible. No Party may seek relief from the Court concerning compliance or non-compliance with the Stipulation until it has met and conferred with the other Party in a good faith effort to resolve or narrow the area of disagreement.

## XII.   MODIFICATION

This Stipulation may be modified by a Stipulated Order of the Parties entered by the Court or by Order of the Court.

**IT IS SO ORDERED** this the 1st day of July, 2025.


By: /s/ David A Sanders
MAGISTRATE JUDGE DAVID A. SANDERS
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI



AGREED TO BY:

| | |
|---|---|
| */s/Donald P. McKenna* | */s/ Edgar Bueno* |
| Donald P. McKenna | David M. Burkoff |
| (*admitted pro hac vice*) | (*admitted pro hac vice*) |
| Calle M. Mendenhall | Edgar Bueno |
| (*admitted pro hac vice*) | (*admitted pro hac vice*) |
| Farris, Riley & Pitt | T. Mills Fleming |
| 1728 3rd Avenue N, Fifth Floor | (*admitted pro hac vice*) |
| Birmingham, AL 35203 | Taylor L. Dove |
| (205) 324-1212 | (*admitted pro hac vice*) |
| | Hunter, Maclean, Exley & Dunn, P.C. |

Fax: (205) 324-1255
cmendenhall@frplegal.com
dmckenna@frplegal.com

Kate Cook
(*admitted pro hac vice*)
Matthew E. Cook
(*admitted pro hac vice*)
Cook Law Group
PO Box 2415
Gainesville, GA 30503
678-928-3899
Fax: 888-612-0589
kate@cook-lawgroup.com
matt@cook-lawgroup.com

Michael S. MacInnis
Rawlings & MacInnis, P.A.
P.O. Box 1789
Madison, MS 39130
601-898-1180
Fax: 601-969-1041
Email: mike@rawlingsmacinnis.net

*Attorneys for Relator Mark Studdard*

Post Office Box 9848
Savannah, GA 31412
912-236-0261
Fax: 912-236-4936
dburkoff@huntermaclean.com
ebueno@huntermaclean.com
mfleming@huntermaclean.com
tdove@huntermaclean.com

Kathryn R. Gilchrist (MB No. 8946)
Elizabeth E. Hyde (MB No. 104089)
Gilchrist Donnell PLLC
609 Steed Road
Ridgeland, MS 39157
601-790-2881
Fax: 601-790-2900
kgilchrist@gilchristdonnell.com
ehyde@gilchristdonnell.com

*Attorneys for the "Magnolia Defendants"*

/s/ John-David H. Thomas
John-David H. Thomas
(*admitted pro hac vice*)
Barnes & Thornburg LLP
1600 West End Avenue
Suite 800
Nashville, TN 37203-3447
615-621-6011
jd.thomas@btlaw.com

J. Cal Mayo , Jr. (MB No. 8942)
Mayo Mallette PLLC
5 University Office Park
2094 Old Taylor Road
Suite 200
Oxford, MS 38655
662-236-0055

/s/ Hugh Ruston Comley
Hugh Ruston Comley (MB No. 102307)
Sidney E. Lampton (MB No. 105957)
WATKINS & EAGER
P. O. Box 650
Jackson, MS 39205-0650
601-965-1941
rcomley@watkinseager.com
slampton@watkinseager.com

*Attorneys for the "Premier Defendants"*

Fax: 662-236-0035
cmayo@mayomallette.com

*Attorneys for the "West Defendants"*